HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

OLYMPIC FOREST COALITION, a Washington nonprofit corporation,

Plaintiff,

v.

UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture, and LINDA GOODMAN, Regional Forester, Pacific Northwest Region of the Forest Service,

Defendants.

Case No. C07-5344-RBL

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE THE DECLARATION OF JONATHAN RHODES

This matter comes before the court on cross-motions for summary judgment. [Dkt. ## 31 and 32]. Plaintiff, Olympic Forest Coalition, challenges the United States Forest Service's approval of a timber sale located in the Olympic National Forest, under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604 *et seq.* Specifically, Plaintiff requests this court to rule as a matter of law that the Environmental Assessment (the "EA") prepared for the Bear Creek Saddle Project was deficient, and that the non-NEPA procedural device, the "Interested Party Letter," used to evaluate the significance of an intervening legal decision failed to cure this deficiency. The United States Forest Service and Linda Goodman[1] [hereinafter

[1] Plaintiff sued Linda Goodman in her official capacity as Regional Forester for the Pacific Northwest Region of the Forest Service. [Dkt. # 1]. On October 5, 2007, the American Forest Resource Council (AFRC), Port Angeles Hardwood, the Washington Contract Loggers Association (WCLA), and Larsen's Timber Resource Management moved to permissively intervene under Fed. R. Civ. P. 24(b)(2). The motion was denied in the liability phase of the proceeding, but granted as to the remedial phase of the suit. [Dkt. #28].

"Defendants"], request the court to affirm agency approval of the decision. Defendants also move this court to strike the declaration of Jonathan Rhodes, Plaintiff's expert witness. This court has reviewed all the materials submitted to the court. For the following reasons, Plaintiff's Motion for Summary Judgment [Dkt. # 31] is GRANTED. Defendants' Cross-Motion for Summary Judgment and Motion to Strike the Declaration of Jonathan Rhodes [Dkt. # 32] are DENIED.

**PROCEDURAL POSTURE AND FACTS**

In April 1994, the Secretaries of Agriculture and Interior issued the Record of Decision ("1994 ROD") for the Northwest Forest Plan[2] ("NFP"). [AR 425-502, 4510-11].[3] The NFP amended the 1990 Olympic National Forest Land and Resource Management Plan ("LMRP"). [*Id.*]. The NFP is a comprehensive and long-term policy for the management of over 24 million acres of public land. [AR 427].

The Aquatic Conservation Strategy ("ACS") is an integral part of the 1994 ROD, developed to maintain and restore the ecological health of watersheds and the aquatic ecosystems therein. [AR 527, 2878]. The ACS has four components: (1) riparian reserves; (2) key watersheds; (3) watershed analysis; and (4) watershed restoration. [AR 530].

In addition, the 1994 ROD identifies the nine objectives of the ACS. To summarize, these objectives are: to "maintain and restore" (1) the distribution, diversity, and complexity of watershed and landscape-scale features to ensure protection of the aquatic systems to which species are uniquely adapted; (2) the spatial and temporal connectivity within and between watersheds; (3) the physical integrity of the aquatic systems, including shorelines, banks, and bottom configurations; (4) the water quality necessary to support healthy riparian, aquatic, and wetland ecosystems; (5) the sediment regime; (6) the in-stream flows sufficient to create and sustain riparian, aquatic, and wetland habitats and to retain patterns of sediment, nutrient, and wood routing; (7) the timing, variability, and duration of floodplain inundation and water table elevation in meadows and wetlands; (8) the species composition and structural diversity of plant communities to provide summer and winter thermal regulation, filtering, and appropriate rates of surface and bank erosion; and (9) the habitat to support well-distributed populations of native plant, invertebrate, and vertebrate riparian-dependent species. [*See* AR 529].

---

[2] The Northwest Forest Plan is formally known as the Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents within the Range of the Northern Spotted Owl.

[3] Citations to the administrative record lodged with the court [Dkt. # 24] will be specified as "AR _."

Furthermore, the 1994 ROD sets out standards and guidelines designed to focus and review proposed and certain existing projects to determine compatibility with these objectives. [AR 528].[4] The 1994 ROD also provides an analytical framework for agency decision makers:

> The standards and guidelines focus on "meeting" and "not preventing attainment" of Aquatic Conservation Strategy objectives. The intent is to ensure that a decision maker must find that the proposed management activity is consistent with the ACS objectives. The decision maker will use the result of watershed analysis to support the finding. The analysis must include a description of the existing condition, a description of the range of natural variability of the important physical and biological components of a given watershed, and how the proposed project or management action maintains the existing condition or moves it within the range of natural variability. Management actions that do not maintain the existing condition or lead to improved conditions in the long term would not "meet" the intent of the ACS and thus, should not be implemented.

[AR 528].

In March 2004, the Forest Service and Bureau of Land Management issued a Record of Decision ("2004 ROD") that amended the 1994 ROD. [AR 2876-96]. Asserting that interpretations of language in the 1994 ROD hindered the ability to follow NFP principles and achieve ecological and economic ACS goals, the 2004 ROD provided "clarifications" to the 1994 ROD. [AR 2878-82]. According to the 2004 ROD, ACS objectives were never intended to be achieved at the project level or in the short term; rather, they were designed to be applied to large-scale watersheds over a period of decades or more. [AR 2878].

The clarification consisted of the removal of certain key passages in the 1994 ROD and the replacement of others. Specifically, the 2004 ROD eliminated the nine ACS objectives as binding standards and guidelines for all projects (except Riparian Reserves), it deleted mandatory ACS analysis for project-level decisions, struck the requirement that the Forest Service must assess ACS consistency at the project level, and removed the requirement that the Forest Service must evaluate short-term effects. [AR 2883-87].

On March 30, 2007, the Honorable Ricardo Martinez, U.S. District Court Judge for the Western District of Washington, set aside the ACS amendments adopted in the 2004 ROD. *See Pacific Coast Fed'n of Fisherman's Ass'ns v. Nat'l Marine Fisheries Serv.*, 482 F.Supp.2d 1248, 1255 (W.D. Wash. 2007) [hereinafter "*PCFFA*"]. Judge Martinez held: (1) the biological opinions on the amendment to the ACS were arbitrary, capricious and contrary to law; (2) the supplemental environmental impact statement issued by defendants, the Departments of Agriculture and Interior, regarding the amendments was arbitrary

---

[4] The Standards and Guidelines for the Northwest Forest Plan can be found in Attachment A to the 1994 Record of Decision. [AR 503-613].

and capricious and contrary to NEPA and the Administrative Procedure Act; and (3) the ACS amendments adopted by defendants in the 2004 ROD were in violation of NEPA and the Endangered Species Act. *Id.* The effect of this decision was to reinstate the legal standards previously in force–namely, the 1994 ROD and its incorporation of the nine ACS objectives.

This case concerns the adequacy of the EA prepared under the 2004 ROD for the proposed Bear Creek Saddle Project located in the Olympic National Forest. As proposed, the Bear Creek Saddle Project (the "Project") would commercially thin approximately 2,189 acres of 45-60 year-old forest stands using a combination of ground-based, cable, and helicopter logging systems. [AR 4510]. The Project would require the utilization of up to 39 miles of new and existing roads. The stated purpose and need of the Project is to "increase the structural diversity of forest stands by developing a multi-layered canopy and other components of late-successional habitat." [AR 4507, 4509].

On April 13, 2004, and April 5, 2005, the Forest Service sent out "scoping" letters describing the Project and requesting public comments. [AR 2897-98, 3396-99]. In May 2006, the Forest Service released the draft EA and again requested comments from the public. On September 15, Dale Hom, the Forester Supervisor, issued the final EA for the Project, a Decision Notice ("DN"), and a Finding of No Significant Impact ("FONSI"). [4684-92]. The EA included an appendix containing the "Forest Service's Response to Comments." [AR 4702]. Plaintiff timely appealed the DN and FONSI on November 3, 2006. [AR 4709-4802]. On December 18, 2006, Jim Golden, the Appeal Deciding Officer, affirmed the Forest Supervisor's decision and denied Plaintiff's requested relief. [AR 4825].

On April 19, 2007, following the *PCFFA* decision, Plaintiff notified the Forest Service of its intent to sue, based in part on Judge Martinez's ruling. [AR 4876-77]. On May 22, the Regional Forester for the Pacific Northwest Region issued a guidance memorandum regarding ACS compliance in response to *PCFFA*. The memorandum acknowledged that the agency was required to assess project-level consistency with the nine ACS objectives contained in the 1994 ROD. However, it also took the position that this only applied to NEPA decisions made after the March 30, 2007 *PCFFA* decision. [AR 4878-80].

On June 8, 2007, Forest Supervisor Dale Hom sent out what defendants call an "Interested Party Letter." It is not clear to whom the letter was sent, but apparently Plaintiff received a copy. It is not disputed, however, that the letter not subject to public comment, nor was it subject to appeal. The letter conveyed Mr. Hom's determination that the Project was consistent with the nine ACS objectives, despite

having been prepared under the 2004 ROD. Attached to the letter was a brief assessment explaining the EA's consistency with each objective. [AR 4886-97]. Accordingly, Hom concluded that a "correction, supplement or revision" to the EA was not necessary, and that the project would be implemented as documented in the September 15, 2006 Decision Notice. [AR 4887].

Plaintiff's complaint alleges violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Council of Environmental Quality's regulations implementing NEPA, 40 C.F.R. §§ 1500-08, and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604 *et seq.* Plaintiff moves for summary judgment, arguing, *inter alia*, that the EA for the Project was inconsistent with the nine ACS objectives and the 1994 ROD, and that the Interested Party Letter did not cure this deficiency. Plaintiff requests the court to hold unlawful and set aside the DN, FONSI, and EA as arbitrary and capricious, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and to remand the decision to the Forest Service pending compliance with NEPA and NFMA. Defendants also move for summary judgment, contending that the Project is consistent with ACS objectives and that the Interested Party Letter was a proper procedural device for addressing the intervening legal decision.

**SUMMARY JUDGMENT STANDARD**

The standard against which the parties' respective motions must be measured is well settled and familiar. Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The parties here agree there are no such genuine issues of material fact; both claim they are entitled to judgment as a matter of law.

**STANDARD FOR REVIEW OF AGENCY DECISIONS**

The agency's actions, findings, and conclusions will be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992 (9th Cir. 2004); 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard requires the court to ensure that an agency has taken the requisite "hard look" at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors and whether there has been a clear error in judgment. *Siskiyou Regional Education Project v. Rose*, 87 F.Supp.2d 1074, 1090 (D. Or.

1999) (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotations omitted). The inquiry must be searching and careful, but the standard of review is a narrow one. *Id.* The court cannot substitute its judgment for that of the agency regarding the environmental consequences of the agency's actions. *Id.* (citing *Association of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1183 (9th Cir. 1997). Thus, although an agency's actions under NEPA are subject to careful judicial scrutiny, courts must also be mindful to defer to agency expertise, particularly with respect to scientific matters within the purview of the agency. *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993.

## LEGAL BACKGROUND

### A. National Forest Management Act, 16 U.S.C. § 1604 *et seq.*

The National Forest Management Act ("NFMA") creates a statutory framework for the management of our national forests. *Neighbors of Cuddy Mountain v. United States Forest Service.*, 137 F.3d 1372, 1376 (9th Cir. 1998). NFMA provides a two-step process for forest planning. *Id.* First, it requires the Forest Service to develop a Land Resource Management Plan ("LRMP") and an Environmental Impact Statement for the entire forest. *Id.*; 36 C.F.R. § 219.10(a), (b). Once the LRMP is established, the second step of NFMA requires the Forest Service to assess site-specific projects, such as the Bear Creek Saddle Project. *Id.* At the site-specific stage, NFMA requires the Forest Service to demonstrate consistency with the LRMP of the larger area. *Id.* at 1376-77; 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e). At both stages, NFMA imposes substantive requirements, such as the need to insure biological diversity. *Cuddy Mountain*, 137 F.3d at 1376.

### B. National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*

"NEPA 'is our basic national charter for protection of the environment.'" *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993. (quoting 40 C.F.R. § 1500.1(a)). It is a procedural statute requiring agencies to assess the environmental consequences of their actions before those actions proceed. *Id.* Pursuant to NEPA, agencies must involve the public, consider alternatives, and disclose the impacts of a proposed action and alternatives before making a decision. 42 U.S.C. § 4332(2)(C); *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 996 ("NEPA requires that the public receive the underlying environmental data from which a Forest service expert derived her opinion.") (citations omitted). The Council on Environmental Quality regulations inform the agencies that "public scrutiny [is] essential," and charge them

to "encourage and facilitate public involvement in decisions" so that "environmental information is available to public officials and citizens before decisions are made." *Id.* (quoting 40 C.F.R. § 1500.1 (b), .2 (d)).

For major federal actions significantly affecting the quality of the human environment, 42 U.S.C. § 4332(2)(C), the agency must prepare an environmental impact statement ("EIS").[5] *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993. "Where an agency is unsure whether an action is likely to have significant environmental effects, it may prepare an environmental assessment ("EA"): a concise public document designed to briefly provide sufficient evidence and analysis for determining whether to prepare an EIS." *Id.* (citing 40 C.F.R. § 1508.9) (internal punctuation omitted). If the EA concludes that the action will have no significant impact on the environment, the agency may issue a Finding of No Significant Impact ("FONSI"). *Id.* The Forest Service took the latter approach in this case.

**DISCUSSION**

There is no dispute that the Forest Service prepared the EA at issue in this case under the 2004 ROD, which was subsequently invalidated. There is also no dispute that the effect of invalidating the 2004 ROD was "to reinstate the rule previously in force"–the 1994 ROD. *See Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005). Plaintiff argues, *inter alia*, that the Bear Creek Saddle EA is inconsistent with the nine ACS objectives set out under the 1994 ROD and is therefore in violation of NEPA. Moreover, Plaintiff contends that in light of *PCFFA*, NEPA required the Forest Service to prepare a Supplemental NEPA document to cure the deficiency in the EA; Plaintiff claims the Interested Party Letter was inadequate for this purpose. Defendants argue that the EA is in fact consistent with the ACS objectives, and furthermore, that the Interested Party Letter was the appropriate response.

While the parties argue at length over the substantive scientific adequacy of the EA, resolution of this case depends on two interrelated procedural issues: (1) whether the underlying EA was rendered deficient by the *PCFFA* decision; and (2) if so, whether the Interested Party Letter was sufficient to cure this deficiency.

**1. The underlying EA became deficient when *PCFFA* set aside the 2004 ROD.**

[5] "An EIS is a thorough analysis of the potential environmental impacts that 'provide[s] full and fair discussion of significant environmental impacts and ... inform[s] decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.'" *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993 (quoting 40 C.F.R. § 1502.1).

As to the first question, after *PCFFA* set aside the 2004 ROD, the Forest Service was obligated to go back and analyze the project under the 1994 ROD. "Setting aside" is a term of art that means vacating; "no other meaning is apparent." *Checkosky v. S.E.C.*, 23 F.3d 452, 491 (D.C. Cir. 1994) (op. of Randolph J.) *superceded on other grounds by rule as stated in Marrie v. S.E.C.*, 374 F.3d 1196 (D.C. Cir. 2004). "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated–not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (citations omitted).

Contrary to Defendants' contention, "when (1) the Court decides a case and applies the (new) legal rule of that case to the parties before it, then (2) it and other courts must treat that same (new) legal rule as 'retroactive,' applying it, for example, to all pending cases, whether or not those cases involve predecision events." *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 752, 115 S.Ct. 1745, 731 L.Ed 820 (1995). This general rule of retroactivity applies to district court decisions as well. *See Nat'l Gas Fuel Corp. v. F.E.R.C.*, 59 F.3d 1281, 1289 (D.C. Cir. 1995) ("The agency must give retroactive effect to the ruling of a federal court because of the nature of that court"). In discussing the trilogy of Supreme Court cases regarding retroactivity, the D.C. Circuit explained, "because the decision of an Article III court announces the law as though it were finding it–discerning what the law is, rather than decreeing what it is changed to, or what it will tomorrow be, all parties charged with applying that decision, whether agency or court, state or federal, must treat it as if it had always been the law." *Id.* (internal citations and quotations omitted).

The Court in *Hyde* outlines few exceptions to this general rule. 514 U.S. at 759. None of those exceptions apply here. Moreover, Defendants do not, and cannot, argue reliance; the decision invalidating the 2004 ROD was rendered before the project began.

When the 2004 ROD was vacated, the public knew that more analysis was required to proceed. Even the Forest Service apparently knew that more analysis was needed, as evinced by the agency's attempt to document consistency with the 1994 ROD in the Interested Party Letter. Thus, because *PCFFA* invalidated the 2004 ROD, the Forest Service was required to conduct analysis as if the 2004 ROD had never been adopted. It did not. Therefore the EA was deficient as a matter of law. The question then becomes whether the Interested Party Letter was a sufficient procedural vehicle under NEPA to cure this deficiency.

**2. The Interested Party Letter was not the proper vehicle to cure the deficiency in the EA.**

The Interested Party Letter prepared by the Forest Service is a form of supplemental information report ("SIR"). SIRs "are the Forest Service's formal instruments for documenting whether new information is sufficiently significant to trigger the need for [a supplemental NEPA document]." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 555 (9th Cir. 2000); Forest Service Handbook 1909.15, ch.10, § 18.1. An agency that has prepared an EIS [or EA] cannot simply rest on the original document, but must be alert to new information that may alter the results of its original environmental analysis; it must continue to take a hard look at the environmental effects of its planned action, even after a proposal has received initial approval. *Id*. at 557; *see also Idaho Sporting Congress, Inc. v. Alexander,* 222 F.3d 562, 566 n.2 (9th Cir. 2000) ("NEPA imposes on federal agencies a continuing duty to supplement existing EAs and EISs in response to significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.") (citations omitted).

An agency must make a reasoned decision based on the significance, or lack of significance, of the new information and must prepare a supplemental NEPA document when there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. *Friends of the Clearwater*, 222 F.3d at 557.

In condoning the use of SIRs, courts have repeatedly warned that once an agency determines that new information is significant, it must prepare a supplemental EA or EIS; SIRs cannot serve as a substitute. *Idaho Sporting Congress*, 222 F.3d at 566; *see also Price Rd. Neighbor. Ass'n v. United States Dept. of Transp.* 113 F.3d 1505, 1510 (9th Cir. 1997) (emphasizing that the procedural document similar to a SIR "was used to make the initial significance determination, not to supplant any documentation that would be required if the threshold were met").

The facts in *Idaho Sporting Congress* and subsequent district court opinion, *Oregon Natural Resources Council Action v. United States Forest Service*, 293 F.Supp.2d 1200 (D. Or. 2003) [hereinafter "*ONRC*"], are particularly relevant to this analysis. First, in *Idaho Sporting Congress*, the Forest Service issued EAs and EISs for timber sales in the Payette National Forest. 222 F.3d at 564. Subsequent to approval of these projects, the Ninth Circuit decided *Neighbors of Cuddy Mountain v. United States Forest Service*, 137 F.4d 1372 (9th Cir. 1998), which interpreted the Payette Forest Plan and found the EIS for a separate project to be inadequate under both NFMA and NEPA. *Id.* at 1382. Following this decision, Idaho Sporting Congress filed a new lawsuit against the Forest Service and forest supervisor to

block additional timber sales in the forest. The district court denied the injunction and the Ninth Circuit affirmed. *See Idaho Sporting Congress v. Alexander*, 173 F.3d 860, No. 99-35047, 1999 WL 170879 (9th Cir. Mar.23, 1999) (unpublished opinion) [hereinafter "*Idaho I*"]. The parties subsequently agreed to a settlement. *Idaho Sporting Congress*, 222 F.3d at 564. Pursuant to the settlement agreement, the Forest Service completed SIRs for the challenged projects and concluded there was "no need to correct, supplement, or revise the environmental document or the Forest Service's decision." *Id.*

Following issuance of these SIRs, Idaho Sporting Congress filed a second lawsuit alleging substantive violations of NFMA and NEPA and sought to enjoin the sales. *Id.* at 564-65. The district denied plaintiff's motion. On appeal to the Ninth Circuit, Plaintiffs argued that the EAs and EISs were deficient in light of *Cuddy Mountain* and that the Forest Service could not use SIRs to correct this deficiency. *Id.* The Ninth Circuit agreed. It found that the Forest Service was not using SIRs for the sole purpose of evaluating new information or changed circumstances, but was using the SIRS to present information and analysis that it was required to include in its original NEPA documents. *Id.* at 566-67. It further determined that the SIRs were not prepared early enough to "serve practically as an important contribution to the decision making process and could not be used to rationalize or justify a decision already made." *Id.* at 567 (citations omitted).

In *ONRC*, the Forest Service prepared multiple EAs during 1997 and 1998 for timber sales located in Oregon. 293 F.Supp.2d at 1202. In accordance with interpretive memoranda in effect at the time these EAs were prepared, the Forest Service did not complete surveys or fulfill management requirements for certain exempted species and timber sales. *Id.* In August 1999, Judge Dwyer held that the interpretative memoranda adopted by the Forest Service was illegal under the Northwest Forest Plan. *Id.* (citing *Oregon Natural Resources Council Action v. United States Forest Service*, 59 F.Supp.2d 1085, 1092 (W.D. Wash. 1999)). Following this decision, the parties settled and it was agreed that the Forest Service would conduct the appropriate surveys and management requirements, documenting these findings in SIRs. *Id.* After the SIRs concluded that no supplemental NEPA document was required, ONRC sued again. Relying heavily on *Idaho Sporting Congress*, the district court held that the underlying EAs were deficient as a matter of law and rejected the use of SIRs to cure the deficiency, finding them inconsistent with NEPA's procedural requirements. *See id.* at 1209.

Here, the procedural posture and facts are closely analogous to the situation in both *Idaho Sporting*

*Congress* and *ONRC*. The Forest Service prepared an EA under what was *at the time* an applicable legal framework (that is, the 2004 ROD); the 2004 ROD was subsequently held invalid by an intervening legal decision (*PCFFA*); the Forest Service attempted to cure the then deficient EA by preparing an Interested Party Letter (a non-NEPA document similar to a SIR); and the Interested Party Letter concluded that the analysis prepared under the 2004 ROD was in fact consistent with the more strict requirements set out in the 1994 ROD and that therefore the project would proceed without provision of any supplemental NEPA document.

Defendants argue that *ONRC* and *Idaho Sporting Congress* are distinguishable because in those cases the intervening decisions did not create any new requirements or change the underlying law. Here, according to Defendants, the *PCCFA* clearly changed the law and imposed new requirements. This argument is not compelling. *PCFFA* did not create new requirements in any meaningful sense. Rather, it merely set aside the 2004 ROD amendments because they violated NEPA and other laws. Accordingly, the effect of the decision was to *resurrect* the laws developed and set out under the original Northwest Forest Plan, not to create new ones.

Defendants characterize the *PCCFA* decision as the type of "changed circumstance" where courts have permitted the use of SIRs. Specifically, they liken the case to *Swanson v. United States Forest Service*, 87 F.3d 339 (9th Cir. 1996). In *Swanson*, the court rejected plaintiff's contention that listing the Chinook Salmon as a threatened species constituted a "significant new circumstance[]" or "information" relevant to environmental concerns that would require a supplemental NEPA document. 87 F.3d at 344; 40 C.F.R. § 1502.9(c)(1)(ii). The court reasoned that listing the salmon as "threatened" changed only "'the legal status of the salmon, but it did not change the biological status.'" *Id.* (quoting *Forest Conservation Council v. Espy*, 835 F.Supp. 1202, 1216 (D. Idaho 1993) *aff'd*, 42 F.3d 1399 (9th Cir. 1994). The Forest Service had previously made a determination independent of the salmon's legal status concluding that it was unlikely that the proposed actions would result in a negative impact on the salmon not already considered. *Id.* (citing *Marsh*, 490 U.S. at 374) (internal punctuation omitted).

This is not a case where the Forest Service is faced with new information or changed circumstances such as a change in the legal status of a species. Nor is this case analogous to any situation where courts have upheld the use of SIRs or a similar non-NEPA environmental evaluation procedure. In *Idaho Sporting Congress*, 222 F.3d at 566, the Ninth Circuit catalogued these cases: *See, e.g., Price Rd.*, 113

F.3d at 1510 (upholding use of "reevaluation" document to determine significance of proposed change to the design of a highway interchange); *Marsh*, 490 U.S. at 383-85 (upholding Army Corps' use of SIR to analyze significance of new reports regarding a dam project); *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218-19 (10th Cir. 1997) (upholding use of SIR to evaluate significance of new survey area of land to be logged); *Laguna Greenbelt, Inc. v. United States Dep't of Transp.*, 42 F.3d 517, 529-30 (9th Cir. 1994) (affirming use of "Memorandum of Record" to evaluate significance of wildfires in project area); *California v. Watt*, 683 F.2d 1253, 1267-68 (9th Cir. 1982), *rev'd on other grounds sub. nom., Secretary of the Interior v. California*, 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984) (allowing use of "Secretary Issue Document" to assess new size estimates for offshore gas and oil deposits).

The 2004 ROD eliminated mandatory legal analyses for determining project-level consistency with the nine ACS objectives. These objectives bear directly on impact to the environment and it cannot be said this potential impact is insignificant. The Forest Service has never produced the ACS analyses required under the 1994 ROD. Moreover, the Forest Service does not persuasively argue that this analyses has ever been produced in a NEPA document, supplemental or otherwise. The Interested Party Letter was not open to public comment or subject to appeal. Therefore, it cannot be said that the letter "serve[d] practically as an important contribution to the decision making process." *See Idaho Sporting Congress*, 222 F.3d at 567.

Accordingly, following *Idaho Sporting Congress* and *ONRC*, the court finds that "it is inconsistent with NEPA for an agency to use a SIR, rather than a supplemental EA or EIS, to correct this type of lapse." *See Idaho Sporting Congress*, 222 F.3d at 567; *ONRC*, F.Supp.2d at 1209. The law compels this court to give considerable deference to agency decision making, particularly when the decisions involve complex scientific expertise. Were this merely a question of science, our decision would likely favor Defendants. But the type of deficiency here is a procedural one. NEPA is a procedural statute and "agency action taken without observance of the procedure required by law will be set aside." *Idaho Sporting Congress*, 222 F.3d at 567 (citations omitted). The decision to forgo a Supplemental NEPA document in light of *PCFFA* was arbitrary and capricious.

**<u>3. The court will not exclude the Declaration of Jonathan Rhodes.</u>**

Defendants also move this court to strike the declaration of Jonathan Rhodes, characterizing it as Plaintiff's attempt to create a "battle of the experts." [Defs. MSJ, Dkt. # 32]. As a general rule, judicial

review of agency actions is limited to the administrative record. *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005); *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988). Evidence outside the record may be considered in limited situations: (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision; (2) when the agency has relied on documents not in the record; (3) when supplementing the record is necessary to explain technical terms or complex subject matter; or (4) when plaintiffs make a showing of agency bad faith. *Southwest Center v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996) (internal citations and quotations omitted). The motion is denied. Although Defendants are correct that much of the declaration consists of arguments that counter the scientific conclusions of the agency, this court does not admit it for that purpose. Rather, the declaration provides the court with much needed explanations of esoteric terms and complex data, found extensively throughout the record and briefing. Therefore, it appropriately fits under *Southwest's* third exception.

**CONCLUSION**

For the above reasons, Plaintiff's Motion for Summary Judgment [Dkt. # 31] is GRANTED. Defendants' Cross-Motion for Summary Judgment and Motion to Strike the Declaration of Jonathan Rhodes [Dkt. # 32] are DENIED. The court sets aside the decision to implement the Bear Creek Saddle Project as proposed, pursuant to the APA, 5 U.S.C. § 706(2)(A), and remands the decision to the Forest Service pending compliance with NEPA's procedural requirements.

IT IS SO ORDERED.

Dated this 9th day of May, 2008.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE